**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **TASHA COMMICK** Individually and as a Representative of a Class of Participants and Beneficiaries on Behalf of the Tenet Healthcare Corporation 401(k) Retirement Savings Plan,<br><br>Plaintiff,<br><br>**vs.**<br><br>**TENET HEALTHCARE CORPORATION, AND TENET HEALTHCARE CORPORATION RETIREMENT PLANS ADMINISTRATIVE COMMITTEE,**<br><br>Defendant. | Case No.: 3:25-cv-02397-S |

**AMENDED CLASS ACTION COMPLAINT**

1. Plaintiffs, Tasha Commick and Darlene Crawford, individually and as representatives of a class of participants and beneficiaries of the Tenet Healthcare Corporation 401(k) Retirement Savings Plan (the "Plan") bring this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001–1461, against Defendants, Tenet Healthcare Corporation ("Tenet" or "Company") and the Tenet Healthcare Corporation Retirement Plans Administrative Committee ("RPAC") (together with Tenet, "Defendants") for: (1) failure to comply with the Plan document; (2) breach of ERISA's fiduciary duties; and (3) violation of ERISA's prohibited transaction rules.

2. ERISA requires a fiduciary to act "solely in the interest of participants . . . for the exclusive purpose of providing benefits to participants and beneficiaries; and defraying reasonable expenses of administrating the plan" to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to

refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest." 29 U.S.C. §§ 1104(a)(1)(A)-(B); 1106(b)(1).

3. The Fifth Circuit recognizes these duties as the "highest known to the law." *Bussian v. RJR Nabisco, Inc.,* 223 F. 3d 286, 294 (5th Cir. 2000).

4. ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham v. Cornell Univ.,* 604 U.S. 693, 697 (2025).

5. ERISA also mandates that fiduciaries must discharge their fiduciary duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. 1104(a)(1)(D). The Supreme Court has clearly stated that there is "no exemption from this duty. . ." *Kennedy v. Plan Administrator for DuPoint Savings and Investment Plan*, 555 U.S. 285, 300, 129 S. Ct. 865 (2009).

6. However, the Supreme Court warns ERISA fiduciaries that they are not immunized from their duties to plan participants when they purport to adhere to a plan document. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA).

7. As detailed below, instead of following the terms of the Plan, and loyally and prudently evaluating how to best deploy plan assets that had been forfeited by departing Plan participants, Defendants instead reflexively and exclusively used those forfeitures to benefit Tenet, to the detriment of the Plan and its participants, by using over $35 million of Plan assets to offset Tenet's contractual obligations to make declared matching contributions to the Plan, while requiring Plan Participants to pay nearly $28 million in Plan expenses to the Plan's third-party

service providers, both directly and indirectly. Even more egregious, during the Class Period[1] Defendants had millions of dollars of leftover forfeitures available at the end of each year that could have defrayed all Plan participants' expenses even after they enriched Tenet with over $35 million in Plan assets, further demonstrating that the fiduciaries' loyalty lies with Tenet or that they lacked a prudent process.

8. To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and prohibited transaction and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate. Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, also bring the claims under 29 U.S.C. § 1132(a)(3) for appropriate equitable relief.

## JURISDICTION, VENUE, ERISA EXHAUSTION

9. This Court has exclusive subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

10. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

---

[1] The term "Class Period" refers to the six years immediately preceding the filing of the initial Complaint.

11. Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

12. Plaintiffs are not required to exhaust administrative remedies under the Plan or ERISA before filing this lawsuit.

13. The claims brought by the Plaintiffs arise from ERISA statutory fiduciary breaches and prohibited transactions under ERISA as to the Plan in its entirety and do not involve mismanagement of individual accounts.

14. The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose benefit claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for ERISA statutory fiduciary breaches and prohibited transactions under ERISA.

15. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation—such as a requirement to exhaust administrative remedies—does not, by itself, bind the Plan.

16. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances—the policy instructing the Court to review and where appropriate defer to a Plan administrator's decision—does not exist here because courts should not defer to Plan administrator's legal analysis and interpretation.

## PARTIES

17. The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) that covers eligible employees of Tenet and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

**Plaintiffs**

18. Plaintiff Tasha Commick is a citizen of the State of California, and was a participant in the Plan during the Class Period. As such, she is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

19. Plaintiff Darlene Crawford is a citizen of the State of Florida, and was a participant in the Plan during the Class Period. As such, she is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

20. During the Class Period, Plaintiffs' individual accounts were charged, and Plaintiffs paid expenses attributable to the maintenance and administration of the investment funds and the administration of the Plan to the Plan's third-party service providers.

21. Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries through the misallocation of Plan assets by Defendants with regard to the Plan as it relates to their individual 401(k) account. This injury is fairly traceable to Defendants' unlawful conduct in using Plan assets for their own benefit and this harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and to the class.

22. Having established Article III standing, Plaintiffs may seek recovery for the entire Plan under 29 U.S.C. § 1132(a)(2).

23. The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan assets in the form of forfeitures)

necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

24. Having never managed a very large 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated by the Defendants and also lacked actual knowledge of how Plan forfeitures were used by the Defendants.

**Defendants and the Plan**

25. Tenet is a multinational healthcare services company based in Dallas, Texas, is publicly traded on the New York Stock Exchange, and reported revenues of billions of dollars during the Class Period, including roughly $20 billion in 2024.

26. With over 140,000 participants and with over $8.7 billion in assets under management as of December 31, 2024, the Plan is one of the largest retirement plans in the country. Throughout the Class Period the plan was always larger than 99.95% of defined contribution plans in terms of both the number of participants and the value of its assets.

27. Tenet is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and the Plan Administrator pursuant to 29 U.S.C. § 1002(16)(A).

28. Tenet delegated its duties as Plan Administrator to the RPAC, including the broad authority over the administration and management of the Plan (hereinafter, Tenet and the RPAC shall be referred to as the "Tenet Plan Fiduciaries").

29. Relevant here, Tenet Plan Fiduciaries fulfilled two distinct functions under ERISA while fulfilling the Plan Administrator role: (1) settlor functions, when deciding the amount of matching contributions Tenet would pay each year; and (2) fiduciary functions, when deciding how to allocate Plan forfeitures.

30. Tenet maintains a duty to monitor RPAC to ensure it adheres to ERISA's fiduciary duties.

**ERISA'S PURPOSE AS APPLIED TO DEFINED CONTRIBUTION PLANS**

31. ERISA was enacted in 1974 to safeguard the interests of the beneficiaries of pension plans broadly, which includes defined contribution plans and 401(k) plans such as the Plan, and imposes standards of conduct on plan Fiduciaries.

32. ERISA includes a required disclosure framework to ensure that retirement plan participants can hold plan fiduciaries accountable for fulfilling their duties required under ERISA because it recognizes that plan participants and beneficiaries will often not have access to details about the conduct of plan fiduciaries. Accordingly, to ensure participants can hold fiduciaries accountable courts recognize that inferences may often be required from limited publicly available information. *See Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Where a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct."); *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106-107 (2d Cir. 2021) ("([W]e are cognizant that ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences" and "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct.").

33. Over the past several decades, defined contribution plans like the Tenet 401(k) Plan have become the primary savings vehicle for most Americans. By 2022 there were more than 121 million participants who were relying on benefits from defined contribution plans to provide some

or all of their retirement benefits. *See* https://www.congress.gov/crs-product/R48470; *LaRue v. DeWolff, Boberg & Assocs*., 552 U.S. 248, 255 (2008) ("Defined contribution plans dominate the retirement plan scene today.").

34. Defined contribution plans allow employees to defer the payment of taxes on compensation contributed to the Plan. As a result, there are many IRS rules and regulations that define the requirements a plan must follow in order to receive the benefit of deferring taxes on contributions. To the extent that employers agree to make contributions to defined contribution plans the employers also receive a tax benefit.

35. A defined contribution plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participants' retirement account in a defined contribution plan equals (1) the amount of the participants' voluntary contributions; plus (2) the amount of any employer contributions; plus (3) any investment returns on those contributions; minus (4) plan and investment expenses paid to third-party service providers. *Cunningham*, 604 U.S. at 697-98 (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.").

36. In addition, employers, like Tenet, also derive many other indirect benefits by virtue of sponsoring defined contribution plans. For example, in addition to tax benefits it is well known that retirement plans are critical tools for employers to attract and retain high quality employees.

37. While all defined contribution plans are drafted with a provision that provides the employer/sponsor the right to terminate the plan at any time, in practice plan sponsors rarely terminate plans because doing so would put them at a substantial competitive disadvantage and make it much more difficult to attract and retain talented employees.

38. As relevant to this case, under the circumstances prevailing well prior to the Class Period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market earnings sooner rather than later and that general understanding applies to both contributions from employees as well as the allocation of Forfeited Plan Assets and employer contributions.

39. For example, ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that the deferrals of Plan Participants are promptly invested pursuant to the direction each Plan participant and are not allowed to sit in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving Plan Participants from the potential for investment earnings. *See, e.g.*, DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); see also 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from the employer's general assets); Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").[2]

---

[2] *See also*, IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other

40. Additionally, as relevant to this case, under the circumstances prevailing well prior to the Class Period, it was and is understood that plan expenses can have a dramatic detrimental impact on the retirement benefits provided by defined contribution plans. For example, according to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement.[3] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[4]

41. Accordingly, participants are better off when their plan expenses are defrayed on an ongoing basis as the expenses are due and incurred. Thus, defraying plan expenses with forfeited plan assets as they occur provides an additional benefit to plan participants when evaluated ***solely*** in the interest of plan participants and for the exclusive purpose of providing benefits ***and*** defraying plan expenses (*see* discussion below).

## ERISA'S FIDUCIARY STANDARDS

42. ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Tenet Plan, that are covered by ERISA.

---

investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

[3] U.S. Dept. of Labor *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at*https://perma.cc/8VCU-E7PC.

43. Defendants are required by ERISA to: "discharge [their] duties with respect to a plan ***solely*** in the interest of the participants and beneficiaries and – (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B) (emphasis added).

44. ERISA explicitly requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

45. ERISA's fiduciary duties are the "highest known to the law," *Bussian v. RJR Nabisco, Inc.,* 223 F. 3d 286, 294 (5th Cir. 2000); *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006).

46. "[C]onflicts of interest can violate ERISA's loyalty requirement." *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401 (9th Cir. 1995).

47. The duty of prudence imposed by 29 U.S.C. § 1104(a)(1) focuses on the thoroughness of a fiduciary's investigation before making a decision and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular" decision. *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021); *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017) ("The prudence standard normally focuses on the fiduciary's conduct in making investment decisions, and not on the results.").

48. A fiduciary's decision-making process is always evaluated based on "the circumstances then prevailing", *i.e.,* the facts the fiduciaries knew at the time or should have known had they employed a prudent process. 29 U.S.C. § 1104(a)(1)(B).

49. "[A] claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed or that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Sacerdote,* 9 F.4th at 108.

50. Additionally, ERISA, 29 U.S.C. § 1104 (a)(1)(D), requires plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan . . ."

51. However, ERISA makes explicit that the fiduciary duties set forth above cannot be overridden by plan terms, stating that fiduciaries must follow plan terms *only* "insofar" as they are "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104 (a)(1)(D); *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA).

52. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enables breaches by other fiduciaries.

53. Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

54. Fiduciaries who carry out both settlor functions and fiduciary functions for a Plan fall under the "two hat" principle of fiduciary conduct outlined by the Supreme Court under ERISA and are required to "wear only one at a time, and wear the fiduciary hat when making fiduciary

decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000). Settlor functions include "decisions relating to the timing and amount of contributions." Lee T. Polk, ERISA Practice and Litigation § 3:32 (2013), while "[f]iduciary functions include, for instance, the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on." *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) (quoting *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1189 (7th Cir. 1994)).

55. Accordingly, the Tenet Plan Fiduciaries are fiduciaries because they are the Plan's Administrator (named fiduciary), vested with authority to manage and administer the Plan, and because they exercised discretionary authority with respect to allocating Plan forfeitures (Plan assets) at issue here.

56. Tenet is also a fiduciary because it is the Plan Sponsor and because it appointed the Plan Administrator (Tenet Plan Fiduciaries) and had a duty to monitor those fiduciaries.

57. Tenet is a party-in-interest because it is an employer "any of whose employees are covered by such plan." *Id.*, § 1002(14)(C).

58. Tenet is a settlor with respect to the decision to include matching contributions in the Plan and the matching formula and the Tenet Plan Fiduciaries are settlors with respect to the decision on how much matching contributions to elect each year.

59. Because Defendants are fiduciaries of the Plan and "deal[t] with the assets of the plan in [their] own interest or for [their] own account," they violated the fiduciary duty of loyalty and engaged in prohibited transactions under both 29 U.S.C. § 1106(a)(1)(D) and 29 U.S.C. § 1106(b)(1), by benefiting themselves as far as reducing their own future contributions to the Tenet Plan, making it unnecessary to take money out of their corporate revenues to support the Plan.

## FACTS APPLICABLE TO ALL COUNTS[5]

### A. The Plan

60. The Plan is a defined contribution plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34) and was created by Tenet for the sole benefit of its eligible employees.

61. The Plan was created and funded several years prior to the Class Period.

62. In accordance with 29 U.S.C. § 1103(a), the Plan's operating documents provide that assets of the Plan are held in a trust fund "the exclusive benefit of the Participants in the Plan or their beneficiaries or the reasonable expenses of Plan administration . . . ."

63. As an individual account, defined contribution retirement plan, a Plan participant's retirement benefit in the Plan equals (1) the amount of the participant's voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses paid to third-party service providers.

64. As the employer and sponsor of the plan (also known as the settlor as that meaning is understood from trust law and used by the DOL in guidance), Tenet drafted and amended the Plan and intended it to comply with the requirements of ERISA and the Internal Revenue Code of 1986, as amended.

### B. Relevant Plan Terms

***Eligibility***

65. In general, all employees are eligible to participate in the Plan.

---

[5] Unless otherwise specified, the facts specific to the Plan in this section are taken from: (1) documents provided by Defendants to Plaintiffs' counsel, including the Plan's operative governing documents during the Class Period; (2) Plaintiffs' Plan documents; (3) the Plan's Form 5500s filed by Defendants with the Department of Labor and publicly available through the "DOL's" website at https://www.efast.dol.gov/5500Search/; and (4) other publicly available information about the Plan.

***Tenet Mandatory Contributions***

66. Throughout the Class Period, the Plan has been funded by a combination of elective deferrals by Plan participants and various types of company contributions, each of which is deposited into the Plan's trust fund and allocated to individual participant accounts.

67. Relevant to this case, employer matching contributions under the terms of the Plan (hereafter "Tenet Matching Contributions") means the matching contributions made by Tenet for a Plan Year, if any, and which become a required and contractual obligation of Tenet once declared.

68. Throughout the Class Period, Tenet made the settlor decision to include Tenet Matching Contributions in the Plan based on a fixed formula that was not to exceed 50% on 6% of eligible participant compensation.[6]

69. Once Tenet declared the amount of Tenet Matching Contributions, Tenet became contractually obligated to make Tenet Matching Contributions to the Plan based on each participant's contributions. Additionally, Tenet then became obligated to fund the full amount of its Tenet Matching Contributions without regard for any Forfeited Plan Assets that may be used to offset the amount of Tenet's Tenet Matching Contributions.

70. During the Class Period, Tenet reported to the DOL in the Plan's annual Form 5500 that Tenet Matching Contributions were declared every year during the class in the amount of 50% of up to 6% of Plan participants' eligible compensation, *i.e.*, the maximum amount authorized under the Plan.

[6] Except for collectively bargained employees whose matching contribution was fixed pursuant to a collectively bargaining agreement.

71. Once those Tenet Matching Contributions were made to the Plan participants, Tenet could not require those Tenet Matching Contributions to be taken out of the Plan and returned to Tenet's corporate accounts.

72. In any event, it follows that the decision related to the amount of Tenet Matching Contributions were made without any regard to the amount of Forfeited Plan Assets available to offset those amounts since the formula was provided to the Tenet Plan Fiduciaries before they were able to calculate the amount of Forfeited Plan Assets that might ultimately be available to offset those matching contributions.

73. Tenet must pay all Tenet Matching Contributions that have accrued throughout a calendar year to the Plan trustee within a reasonable period of time after the end of the prior calendar year.

74. In every year during the Class Period, Tenet was contractually obligated to make Tenet Matching Contributions to the Plan.

75. Upon their deposit into the Plan's trust fund, all participant contributions and Tenet Matching Contributions become assets of the Plan.

***Vesting and Forfeiture of Tenet Matching Contributions***

76. Under the terms of the Plan, participants are immediately vested in their own contributions, as well as any actual earnings thereon. Participants are vested in Tenet Matching Contributions and any actual earnings thereon based on a five-year graded schedule before being fully vested.

77. To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of Tenet contributions and any actual earnings thereon (hereafter "Forfeited Plan Assets") in his or her account on the earlier of the date the participant takes a

distribution of his or her vested interest in the Plan or the date the participant incurs a five-consecutive-year break in vesting service (within the meaning of the Plan document).

78. Additionally, under ERISA, Plan Fiduciaries always may choose to allocate Forfeited Plan Assets to the accounts of eligible Plan participants if no other options are available. *See* 29 U.S.C. § 1002(34) (Plan Fiduciaries have discretion to allocate "forfeitures of accounts of other participants" to eligible participants).

***Plan Administration***

79. Throughout the Class Period the Plan paid direct and/or indirect compensation to third-party service providers for services to administer the Plan ranging from, among others, recordkeeping and information management, administration, account maintenance, loan processing, professional fees, investment advisory and management fees, and securities brokerage services paid directly and indirectly by the Plan. Hereafter the payment for services provided to the Plan (directly or indirectly) shall collectively be referred to as "Plan Expenses" (also referred to as "Expenses of Administration" or "administrative expenses" in the Plan document).

80. The third-party service providers (listed in the Plan's Form 5500), that were paid for Plan Expenses include but are not necessarily limited to Fidelity Investments Institutional and Morgan Stanley. For example, the Plan disclosed that Fidelity Investments Institutional received $3,210,196 from Plan assets in direct compensation in 2023 as well as an undisclosed amount of indirect compensation.

81. The use of Plan assets to pay Plan Expenses reduces the funds available to Plan participants for distribution and/or investing,and thereby reduces the value of individual participant accounts and deprives the Plan of funds that otherwise would have been earned on the amounts deducted.

**TENET PLAN FIDUCIARIES IMPRUDENT AND DISLOYAL ALLOCATION OF FORFEITED PLAN ASSETS**

**A. Tenet Plan Fiduciaries Use of Forfeited Plan Assets During the Class Period**

82. From 2019 through 2024, the terms of the Plan obligated Tenet to make matching contribution to the Plan in the following amounts: (1) in 2019, at least $134,996,029[7]; (2) in 2020, at least $129,295,677; (3) in 2021, at least $122,678,080; (4) in 2022, at least $122,365,858; (5) in 2023, at least $123,977,046; and (6) in 2024, at least $127,895,549.

83. From 2019 through 2024, the Tenet Plan Fiduciaries' violations of the terms of the Plan document and ERISA, allowed Tenet to offset its obligation to make Tenet Matching Contributions by allocating Forfeited Plan Assets in the following amounts: (1) in 2019, $6,500,000; (2) in 2020, $3,500,000; (3) in 2021, $6,046,000; (4) in 2022, $6,500,000; (5) in 2023, $6,018,920; and (6) in 2024, $6,801,138. These actions saved Tenet tens of millions of dollars, which flowed directly to its bottom-line profit.

84. From 2019 through 2024, the Tenet Plan Fiduciaries were required under the terms of the Plan and ERISA to direct the use of Forfeited Plan Assets in the following minimum amounts: (1) in 2019, approximately $12,456,003[8]; (2) in 2020, approximately $9,941,180; (3) in 2021, approximately $14,059,886; (4) in 2022, $13,238,154; (5) in 2023, $13,976,222; and (6) in 2024, approximately, $14,988,255.

---

[7] Derived from the Plan's 2019-2024 Forms 5500s. For 2019, the figure was derived from Tenet's disclosed contribution amount net of forfeitures of $128,496,029 plus $6,500,000 of Forfeited Plan Assets that were used to reduce Employer Contributions. This methodology was used for each subsequent year.

[8] Derived from the Plan's 2019-2024 Forms 5500s. For 2019, the amount of $12,456,003 represents the $6,656,875 of Forfeited Plan Assets that were used during the year plus the $5,799,128 in unallocated Forfeited Plan Assets in the plan on December 31, 2019. This methodology was used for each subsequent year.

85. From 2019 through 2024, the Tenet Plan Fiduciaries caused Plan participants to pay Plan Expenses to the Plan's third-party service providers through deductions from their accounts and indirectly through revenue sharing or similar methods. The minimum direct amounts paid by participants were: (1) in 2019, $5,517,384; (2) in 2020, $5,918,330; (3) in 2021, $6,026,908; (4) in 2022, $5,776,713; (5) in 2023, $5,095,550; and (6) in 2024 $4,902,638.[9]

86. Throughout the Class Period, the terms of the Plan required Tenet Plan Fiduciaries to use Forfeited Plan Assets to provide benefits and defray Plan Expenses "as soon as administratively practicable." As of December 31, each year from 2019 through 2024, unallocated Forfeited Plan Assets remained unused in the following amounts: (1) in 2019, $5,799,128; (2) in 2020, $5,523,868; (3) in 2021, $7,098,572; (4) in 2022, $6,018,416; (5) in 2023, $7,149,627; and (6) in 2024, $7,490,782.

87. At all times during the Class Period, it was administratively feasible to use Forfeited Plan Assets to provide retirement benefits and defray Plan Expenses and avoid carrying these amounts in an unallocated plan account over to the next calendar year.

88. From 2019 through 2024, the Plan Fiduciaries used only $4.2 million out of over $47 million in Forfeited Plan Assets available to reduce Plan Expenses.

89. In other words, throughout the Class Period Tenet Plan Fiduciaries used less than 9% of the Forfeited Plan Assets to defray Plan Expenses as instructed by the Plan.

90. The following chart demonstrates the Plan Fiduciaries' disloyal and conflicted use of forfeitures during the Class Period:

---

[9] The amount of Administrative Expenses specifically identified in this Amended Complaint likely understates the actual Administrative Expenses paid by Plan Participants because the amounts do not include undisclosed indirect compensation paid by Plan Participants.

| YEAR | FORFEITURES USED FOR TENET | FORFEITURES USED FOR PLAN ADMIN EXPENSES | EXPENSES CHARGED TO THE PLAN (Direct Compensation) | BALANCE AT YEAR END NOT USED |
|---|---|---|---|---|
| 2019 | $6,500,000 | $156,875 | $5,517,384 | $5,799,128 |
| 2020 | $3,500,000 | $917,312 | $5,918,330 | $5,523,868 |
| 2021 | $6,046,000 | $915,314 | $6,026,908 | $7,098,572 |
| 2022 | $6,500,000 | $719,738 | $5,776,713 | $6,018,416 |
| 2023 | $6,018,920 | $807,675 | $5,095,550 | $7,149,627 |
| 2024 | $6,801,138 | $696,335 | $4,902,638 | $7,490,782 |
| **Total** | **$35,366,058** | **$4,213,249** | **$33,237,523** | **$39,080,393** |

### B. Tenet Plan Fiduciaries Breach of the Duty to Follow the Plan Terms

91. During the Class Period, the Plan document stated and required that Plan Expenses "*will be paid from forfeitures . . . to the extent they are sufficient . . . .*"

92. Accordingly, Forfeited Plan Assets should have been used to pay all Plan Expenses *prior to* using Forfeited Plan Assets to reduce any Tenet Matching Contributions.

93. It is clear that the Plan's sponsor, Tenet, intended that Forfeited Plan Assets be used first to pay Plan Expenses prior to reducing declared Tenet Matching Contributions because the Summary Plan Document distributed by Tenet to all Plan participants explicitly states that "Forfeitures from the non-vested portion of a terminated participant's employer matching source **that are not used to pay 401(k) Plan administrative expenses** may be used to meet Tenet's contribution obligations under the Plan." (emphasis added). Accordingly, under the terms of the Plan document, the Tenet Plan Fiduciaries did not have discretion related to the use of Forfeited Plan Assets.

94. Under ERISA, when making the decision regarding the use of Forfeited Plan Assets, the Plan Fiduciaries have been and are required by 29 U.S.C. § 1104 (a)(1)(D) to discharge their duties "in accordance with the documents and instruments governing the plan . . . "

95. Contrary to the Plan document, the Tenet Plan Fiduciaries failed in each year during the class to first use Forfeited Plan Assets to defray all Plan Expenses before using Forfeited Plan Assets to benefit Tenet.

96. Upon information and belief, the Tenet Plan Fiduciaries have continued to violate the explicit terms of the Plan document by failing to use Forfeited Plan Assets to first defray Plan Expenses.

### C. <u>ERISA's Duty of Prudence as Applied to Forfeited Plan Assets</u>

97. Even if the Plan did not mandate that Tenet Plan Fiduciaries first defray all Plan Expenses with Forfeited Plan Assets, the Tenet Plan Fiduciaries under ERISA and the Plan certainly had discretion to do so and, as such, are held to ERISA's stringent fiduciary duties when deciding how to allocate Forfeited Plan Assets.

98. Well prior to the Class Period, like all prudent defined contribution plan fiduciaries and plan sponsor/employers/settlors, the Defendants knew that a defined contribution "plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula in the plan." IRS Field Assistance Bulletin 2008-01, page 4.

99. Similarly, all prudent defined contribution plan fiduciaries and employers knew that to ensure their plans remained qualified under the IRS Code, there were only a few allowable uses of Forfeited Plan Assets, primary among them being to defray plan expenses or reduce employer contributions. *Id*.

100. Accordingly, when designing their plan, employers had a few limited options to choose from with respect to the treatment of Forfeited Plan Assets. Employers that wanted all Forfeited Plan Assets to be used first to reduce employer contributions prior to defraying plan expenses could (and some have) drafted the terms of the plan to explicitly require that.

101. For example, during the Class Period, several other large plan sponsors drafted their plans to specifically require forfeited plan assets to be used to offset the employer's matching and discretionary contributions *prior to* using Forfeited Plan Assets to defray plan expenses or to even prohibit using Forfeited Plan Assets to defray plan expenses.

102. Of course, the opposite is also true. Prior to and throughout the Class Period several employers drafted their plans to preclude or limit the use of Forfeited Plan Assets to offset employer contributions. Accordingly, just because using forfeited plan assets to offset employer contributions is permissible under ERISA in some cases, does not make it permissible under ERISA in all cases.

103. This Plan is more in accord with Plans that require the fiduciaries to first pay plan expenses because the Plan states that Plan Expenses will be paid from Forfeited Plan Assets. Accordingly, employers that chose to draft their plans that, when read as a whole, provide for prioritization of Plan Expenses, or at the very minimum provide discretion to plan fiduciaries with respect to forfeited plan assets, clearly intended their plan fiduciaries to use a prudent process to determine which of any available uses of forfeited plan assets would satisfy the terms of that particular plan.

104. In other words, after prudently assessing the amount in Forfeited Plan Assets and Plan Expenses for the year, prudent fiduciaries need to have processes in place to assess what the

next most prudent option is to apply any potential surplus of Forfeited Plan Assets that year in case Forfeited Plan Assets exceed Plan Expenses that year.

105. A plan fiduciary that exercises discretion to defray plan expenses is not providing a benefit greater than what was required or intended by the plan sponsor/employer (settlor). Rather, plan sponsor/employers that grant discretion and or priority to plan fiduciaries to use Forfeited Plan Assets to defray plan expenses are specifically intending to provide a benefit under the plan (*i.e.*, to use Forfeited Plan Assets to defray plan expenses) that is specifically contemplated as not only a benefit under ERISA, but also a default duty to defray plan expenses absent some prohibition in the plan document. *See* 29 U.S. Code § 1104(a)(1)(A) (noting plan fiduciaries are required to act solely for the exclusive purpose of defraying the expenses of administering the plan). As noted above, employers were always aware that they could design the plan to prevent the use of Forfeited Plan Asset to defray plan expenses. Here, the employer chose close to the opposite.

106. Accordingly, throughout the entire Class Period, a prudent fiduciary as part of a prudent fiduciary process would have always considered whether using Forfeited Plan Assets to defray Plan Expenses was more consistent with their duties under the plan and ERISA than using Forfeited Plan Assets to offset declared matching contributions. As set forth in detail below, the facts and circumstances here support a finding that, throughout the Class Period, a prudent fiduciary of the Plan employing a prudent process would have chosen to use Forfeited Plan Assets to defray all Plan Expenses during the Class Period.

107. The Plan fiduciaries' choices needed to be guided by ERISA's requirement that the determination would be made for the exclusive purpose of providing benefits ***and*** defraying plan expenses. *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

108. A prudent independent and non-conflicted Plan Fiduciary would have no reason to fail to use forfeited plan assets to defray plan expenses when that was an allowable, prioritized option under the terms of the Plan.

109. Accordingly, at least once a year a prudent plan fiduciary would have coordinated with Tenet to determine how much, if any, of the Forfeited Plan Assets Tenet would be enough to pay all Plan Expenses.

110. After that determination, if needed, a prudent plan fiduciary would determine how the remaining Plan Expenses would be paid; or if Forfeited Plan Assets exceeded Plan Expenses, determine where to apply the rest of the funds.

111. Both ERISA and the IRS Code contemplate the use of Forfeited Plan Assets to defray plan expenses as a potential benefit under a defined contribution plan. As a result, the clear intention of employers who give discretion to plan fiduciaries to defray plan expenses is to make defraying plan expenses one of the benefits provided under the terms of the Plan.

112. Critically, when a plan sponsor/employer makes a decision to provide a discretionary matching contribution or a plan fiduciary decides the amount of a discretionary matching contributions (as is the case here) they are acting as settlors and not in a fiduciary capacity with respect to the plan. In fact, a plan sponsor/employer/fiduciary that makes a decision to make a discretionary contribution makes that decision solely in the interest of the employer and for the exclusive purpose of benefiting the employer.

113. In contrast, a plan fiduciary making fiduciary decisions with respect to Plan assets based on the discretion granted by the plan sponsor/employer is explicitly prohibited from considering the interest of the employer while wearing its fiduciary hat.

114. As set forth in detail below, there is no plausible or conceivable set of facts or circumstances here that would support a finding that, throughout the Class Period, a loyal and prudent Plan fiduciary of the Tenet Plan would have chosen to use Forfeited Plan Assets to offset substantial amounts of Tenet Matching Contributions, while only defraying a small fraction of Plan Expenses on an ongoing basis under these Plan terms.

115. There is no dispute that under the terms of the Plan defraying Plan Expenses is not just allowable, but also the prioritized use of Forfeited Plan Assets.

116. The terms of the Plan reflect the Tenet Plan Fiduciaries should exercise their discretion with priority related to the use of Forfeited Plan Assets and determine that defraying Plan Expenses was more consistent with their duties under the Plan and ERISA than using Forfeited Plan Assets to offset Employer Contributions, when no factors are present indicating otherwise.

### D. Tenet's Breaches of the Duty of Prudence

***Misallocation of Forfeited Plan Assets***

117. ERISA's fiduciary duty of prudence is violated where, as here, the Tenet Plan Fiduciaries faced with a fiduciary decision each year in choosing between allocating Forfeited Plan Assets toward offsetting declared Tenet Matching Contributions or defraying Plan Expenses that would otherwise be borne by Plan participants, failed to conduct any investigation as to which choice would be in the best interest of the participants.

118. If the Tenet Plan Fiduciaries had employed a prudent process every year immediately prior to and throughout the Class Period, they would have used the Forfeited Plan Assets to defray all Plan Expenses under the terms of this plan which prioritizes this option.[10]

119. In fact, however, the Tenet Plan Fiduciaries allocated only a small fraction of the Forfeited Plan Assets available to defray Plan Expenses.

120. In other words, after Tenet made an independent settlor election to offer Tenet Matching Contributions and the Tenet Plan and Tenet Plan Fiduciaries made the independent settlor decision on the amount of Tenet Matching Contributions, without any reference to the amount of Forfeited Plan Assets, the Tenet Plan fiduciaries imprudently coordinated with Tenet and the Plan's recordkeeper to calculate how much of the Forfeited Plan Assets would be used to offset matching contributions, while still allowing Plan Expenses to be deducted from the accounts of Plan participants.

121. Because the Tenet Plan fiduciaries always had the ability to defray Plan Expenses with Forfeited Plan Assets but hardly ever did (from 2019 through 2024 less than 9% of all available Forfeited Plan Assets were used for defraying Plan Expenses), it is reasonable to infer that the Tenet Plan Fiduciaries employed a flawed decision-making process or did not employ any process at all to determine how to allocate Forfeited Plan Assets.

122. The Tenet Plan Fiduciaries did not, for example, investigate whether there was any set of circumstances that would support a decision to reduce declared Tenet Matching

---

[10] In other words, to the extent that the Forfeited Plan Assets exceeded the foreseeable future ongoing Plan Expenses of the Plan as evaluated ***solely*** in the interest of Plan participants and for the exclusive purpose of providing benefits to participants ***and*** defraying the Plan Expenses of the Plan, then the Forfeited Plan Assets can be used to offset Tenet's declared matching contributions. Defendants are solely in the possession of the documents that would be necessary to review and evaluate that determination.

Contributions prior to defraying Plan Expenses, which are prioritized under the Plan, and there are no facts or circumstances that could possibly make the Tenet Plan Fiduciaries' failure to use Forfeited Plan Assets to defray Plan Expenses prudent.

123. ***First***, there is no indication that using Forfeited Plan Assets to offset declared Tenet Matching Contributions was necessary for Tenet to maintain their past contribution levels, as there are no facts or circumstances to suggest that Tenet's process in determining the amount of matching contributions it authorized in the Plan or the amount that Tenet Plan Fiduciaries elected is based on any consideration of the amount of Forfeited Plan Assets. In fact, just like all other companies that have discretionary company contribution provisions, every year throughout the Class Period, Tenet's decisions to offer matching contributions were made without reference to the amount of Forfeited Plan Assets and were instead driven by the need to attract and retain talented employees and the Tenet Plan Fiduciaries simply selected the same amount of Tenet Matching Contributions authorized under the Plan each year.

124. Companies like Tenet use their past benefit history to both attract new employees and promote to their existing employees the benefits provided by the plan design even if those benefits are discretionary.

125. In other words, companies like Tenet use the amounts they have contributed as company contributions in prior years as part of their efforts to attract and retain talented employees in a competitive environment in which other companies are also competing with Tenet to attract and retain the same potential employees. Tenet's decision to elect to offer matching contributions, and the amount of those declared matching contributions, is based primarily on the competitive environment related to other companies that may compete for talented employees and is not made

with any consideration of the amount of Forfeited Plan Assets held in (or expected to be held in) an unallocated plan account at the time the Matching contributions are made.

126. For example, in 2024 the amount of Plan Expenses that the Tenet Plan Fiduciaries caused Plan participants to pay through deductions from their Plan accounts comprised less than 4% of the $127,895,549 of Tenet Matching Contributions obligated to be contributed by Tenet.

127. In other words, the Plan Expenses are immaterial to both Tenet's decision to provide matching contributions or the Tenet Plan Fiduciaries' decision on the amount of Tenet Matching Contributions, and other contributions as well as Tenet's financial results.

128. While the Tenet Matching Contributions are initially discretionary, Tenet made the settlor decision to offer Tenet Matching Contributions at the beginning of the Class Period and the Tenet Plan Fiduciaries make the settlor decision about the amount of the Tenet Matching Contributions in advance. Once these settlor decisions are made, the Tenet Plan Fiduciaries know the exact amount of declared Tenet Matching Contributions and only make fiduciary decisions with respect to Plan assets based on the actual Tenet Matching Contributions declared by Tenet, *i.e.*, the circumstances then prevailing. Therefore, it is irrelevant for the Tenet Plan Fiduciaries' decision-making process with respect to the allocation of Forfeited Plan Assets that the matching contributions were discretionary in the past before they became contractual obligations.

129. ***Second***, there are no facts to suggest that Tenet would be unable to meet its future Tenet Matching Contributions, such that using Forfeited Plan Assets to offset Tenet Matching Contributions was necessary.

130. Upon information and belief, Tenet was able to meet its future contributions throughout the Class Period and would have been able to meet its declared Tenet Matching

Contributions each year, even if no Forfeited Plan Assets were applied to offset its contributions. In fact, throughout the Class Period Tenet had tens of billions of dollars of revenues.

131. Even assuming there was some indication that Tenet would be unable to meet future Tenet Matching Contributions (which is not the case here), a prudent fiduciary would only offset the amount necessary to prevent Tenet from being unable to meet its future contributions, and then allocate the remaining funds to other more beneficial options, like reducing Plan Expenses shouldered by the Plan participants.

132. Consequently, an objective analysis of the available options throughout the Class Period, guided by ERISA's fiduciary duty of prudence would indisputably not result in Tenet Plan Fiduciaries choosing to use the overwhelming share of Forfeited Plan Assets available to offset future matching contributions year after year throughout the Class Period instead of using Forfeited Plan Assets to defray some or all Plan Expenses.

133. Instead of acting prudently by using Forfeited Plan Assets to defray Plan Expenses charged to the individual accounts of Plan participants on an ongoing basis (or allocating the Forfeited Plan Assets to the accounts of eligible Plan participants if there was no other option available), the Tenet Plan Fiduciaries (based on the information provided in the Plan's Form 5500s) chose to use virtually all the Forfeited Plan Assets (almost 90%) for the purpose of offsetting Tenet Matching Contributions obligations to the Plan, thereby saving Tenet millions of dollars at the expense of the Plan.

134. Prudent fiduciaries following a prudent process would not choose to offset Tenet Matching Contributions obligations instead of reducing the Plan participants' Plan Expenses or, alternatively allocating the Forfeited Plan Assets back to the accounts of Plan participants to be used to defray Plan Expenses.

***Failure to use Unallocated Forfeited Plan Assets***

135. The Tenet Plan Fiduciaries' conduct, at the very least, necessitates the inference that either it did not have processes in place to weigh the benefits to participants of alternative options for allocating Forfeited Plan Assets or, alternatively, the process employed was fatally flawed.

136. The Tenet Plan Fiduciaries were required to monitor Forfeited Plan Assets and should have ensured that all Forfeited Plan Assets for the plan year were promptly exhausted by year end or shortly thereafter, and did not remain in an unallocated Plan account.

135. Even though there were sufficient unallocated Forfeited Plan Assets to defray some or all of the Plan Expenses during each year of the Class Period, Tenet Plan Fiduciaries nevertheless chose to allow the unallocated Forfeited Plan Assets in each year to remain unused.

136. A prudent fiduciary employing a prudent process would, at a minimum of once a year, coordinate with the Plan's recordkeeper to determine the amount of unallocated Forfeited Plan Assets available. To the extent there were unallocated Forfeited Plan Assets, a prudent fiduciary would evaluate how to use the unallocated Forfeited Plan Assets solely in the interest of the participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1).

137. The Tenet Plan Fiduciaries, following a prudent process, would not have allowed millions in Forfeited Plan Assets to accumulate in an unallocated plan level account when the Plan's terms give Tenet Plan Fiduciaries the discretion to use Forfeited Plan Assets to defray Plan Expenses, especially when the amount of the Forfeited Plan Assets that remained at the end of each calendar year could substantially defray Plan Expenses during the Class Period.

138. The Tenet Plan Fiduciaries did not, for example, investigate whether there was any set of circumstances that would support a decision to not use unallocated Forfeited Plan Assets to defray Plan Expenses and allow millions of Plan assets to go unused.

139. The Tenet Plan Fiduciaries' repeated practice of failing to promptly allocate Forfeited Plan Assets show that the Plan Fiduciaries either had no prudent process in place to determine how to use Forfeited Plan Assets or, alternatively, employed a flawed process.

140. The Tenet Plan Fiduciaries violated its fiduciary duty of prudence by not using unallocated Forfeited Plan Assets, thereby causing Plaintiffs and other Plan participants to pay for millions in Plan Expenses that should have otherwise been defrayed.

**E. The Plan Fiduciaries' Breaches of the Duty of Loyalty**

141. Throughout the Class Period loyal fiduciaries were required to make decisions with respect to the allocation of Forfeited Plan Assets, "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

142. As discussed above, the Tenet Plan Fiduciaries only used a small portion of Forfeited Plan Assets to reduce the Plan's Expenses, which would have benefited the Plan's participants rather than Tenet and not violated the Plan terms.

143. Using Forfeited Plan Assets to reduce current and future employer contributions is always in the best interest of Tenet because that option decreases Tenet's own contribution costs and means that Tenet does not need to take money out of its own general revenues to pay for Plan contributions.

144. The option to reduce future employer contributions may be in the best interests of Plan participants where there is a risk that Tenet may be financially unable to satisfy its contribution obligations.

145. Absent a risk that Tenet would be unable to satisfy its contribution obligations under the Tenet Plan, however, using Forfeited Plan Assets to defray Plan Expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such Plan Expenses.

146. In deciding between using the Forfeited Plan Assets to benefit Tenet or the Plan participants, Tenet Plan Fiduciaries are presented with a conflict of interest in administering the Plan and managing and disposing of their assets.

147. In using Forfeited Plan Assets overwhelmingly to reduce Tenet's employer contribution obligation, even though it was permitted to and prioritized under the Plan terms use those Forfeited Plan Assets to pay Plan expenses for participants, Tenet was motivated solely by self-interest and breached its duty of loyalty.

148. Further, given that the Plan prioritized paying Plan Expenses with Forfeited Plan Assets, it follows that Tenet Plan Fiduciaries imprudently and disloyally coordinated with Tenet to circumvent the Plan terms and benefit Tenet.

149. In other words, the Tenet Plan Fiduciaries improperly, imprudently, and disloyally coordinated with Tenet and the Plan's recordkeeper to calculate how much of the Forfeited Plan Assets would be used to reduce Tenet Contributions and provided that direction to the Plan's recordkeeper.

151. It is reasonable to infer that the Tenet Plan Fiduciaries engaged in this conduct due to their conflict of interest based on their desire to reduce amounts owed to the Plan by Tenet. The

only reasonable explanation and inference to be drawn from the conduct of the Tenet Plan Fiduciaries is that they discharged their duties considering the best interests of Tenet as opposed to solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan because no facts were present that would justify their actions otherwise.

152. In every year prior to and throughout the Class Period, there are no known facts or circumstances that would support a decision by independent and unconflicted Tenet Plan Fiduciaries to fail to use Forfeited Plan Assets to defray plan expenses on an ongoing basis. Rather, the only plausible inference to be drawn based on the conduct of the Tenet Plan Fiduciaries is that they made the decision to use Forfeited Plan Assets to offset Tenet Matching Contributions was made prioritizing the interest of Tenet over that of the participants.

153. In every year prior to and throughout the Class Period, there are no facts or circumstances that are publicly available or have been provided by Tenet Plan Fiduciaries that would support a finding that failing to use Forfeited Plan Assets to defray Plan expenses was more consistent with the Plan Fiduciaries' duty to discharge their duties solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan.

154. The facts and circumstances alleged herein are consistent with the Tenet Plan Fiduciaries trying to increase Tenet's profit, despite their fiduciary duties to act solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

155. Tenet was motivated by self-interest and breached its duty of loyalty.

***********************

156. To be clear, as described above, Plaintiffs do not allege that ERISA prohibits fiduciaries from *ever* using Forfeited Plan Assets to offset company contributions. Rather, Plaintiffs allege that under the specific facts and context of this Plan—where the Tenet Plan Fiduciaries was accorded discretion by the Plan over how to allocate Forfeited Plan Assets—a prudent and loyal fiduciary would not make the decisions that the Tenet Plan Fiduciaries made (as alleged above). Here, under the circumstances described, it is reasonable to infer that the Tenet Plan Fiduciaries did not employ a prudent fiduciary decision-making process and thus breached their fiduciary duty of prudence. *See e.g., Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 108-09 (2d Cir. 2021) ("[We] caution against overreliance on . . . other ERISA cases as benchmarks. While such comparisons may sometimes be instructive, their utility is limited because the assessment of any particular complaint is a context-specific task. We cannot rule out the possibility that a fiduciary has acted imprudently by including a particular fund even if, for example, the fees that fund charged are lower than a fee found not imprudent in another case.").

157. In summary, the totality of the specific facts and circumstances of the Plan and the conduct of the Tenet Plan Fiduciaries throughout the Class Period demonstrates that the Tenet Plan Fiduciaries failed to administer the Plan in a prudent and loyal manner.

## **TRANSACTIONS PROHIBITED BY ERISA**

158. ERISA's prohibited-transaction provisions impose "categorical" restrictions designed to protect plan assets from conflicted, insider transactions. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000).

159. Section 406(a) prohibits fiduciaries from causing a plan to engage in certain transactions with parties in interest, including any "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

160. Section 406(b) separately prohibits fiduciaries from "deal[ing] with the assets of the plan in [their] own interest," *id.* § 1106(b)(1), or "act[ing] in a transaction" involving plan assets "on behalf of a party… whose interests are adverse to the interests of the plan," *id.* § 1106(b)(2).

161. *Cunningham v. Cornell University*, 604 U.S. 693 (2025), reinforces that ERISA § 406(a) imposes "categorical" prohibitions on certain transactions and that plaintiffs need only plead the statutory elements of § 406(a)(1) to state a claim. *Id.* at 700.

162. *Cunningham* makes clear that § 1106(a)(1)'s prohibitions apply whenever a fiduciary causes a plan to engage in a transaction falling within the statutory language. Although *Cunningham* did not address the meaning of "use" under § 406(a)(1)(D) or the application of forfeitures to reduce employer contributions, those questions are resolved by the growing body of forfeiture-specific cases, many of which hold that a fiduciary "uses" plan assets for the employer's benefit when it applies forfeitures to reduce employer contributions—even where no funds leave the plan trust.

163. When a fiduciary applies forfeitures in a manner that relieves the employer of a financial obligation, the fiduciary has engaged in a prohibited "use" of plan assets, even without a literal transfer of funds.

164. An employer's reallocation of undisputed plan assets to reduce its own matching contribution is a 'use' of plan assets for the purposes of § 1106(a)(1)(D). This is because allocating

forfeitures to reduce employer contributions is not an internal bookkeeping measure—it is a disposition of plan assets that directly benefits the employer.

165. A party in interest includes an employer whose employees are covered by the plan. 29 U.S.C. § 1002(14)(C).

166. Tenet saved millions of dollars in employer contributions by using forfeitures to satisfy obligations it otherwise would have paid from corporate funds.

167. That is a direct "transfer to" or "use for the benefit of" a party in interest under § 406(a)(1)(D).

168. The allocation of forfeitures to reduce employer contributions necessarily reduces the employer's financial obligation to the Plan. Forfeiture allocation operates "between" the plan and employer because it alters the employer's contribution obligations, violates § 406(a)(1)(D).

169. Similarly, Section 406(b)(1) bars a fiduciary from "deal[ing] with the assets of the plan in his own interest," and § 406(b)(2) prohibits a fiduciary from acting for the benefit of a party adverse to participants. Plaintiffs allege that Tenet acted in both capacities—first, as fiduciary allocating forfeitures, and second, as employer who benefitted directly from that allocation.

170. A fiduciary breaches § 406(b) when it uses plan assets in a manner that relieves the employer of financial obligations.

171. Because Tenet's allocation decisions relieved itself of substantial financial obligations while providing no corresponding benefit to Plan participants, prohibited self-dealing exists under § 406(b).

172. Reducing employer contributions is not merely an "intra-plan transfer" and is a "transaction" under § 406.

173. An intra-plan movement of assets constitutes a prohibited transaction if it: (1) involves plan assets; (2) benefits a party in interest or fiduciary; and (3) results from a fiduciary decision.

174. Tenet caused plan assets to be used to reduce its own contribution obligations. That is "dealing with" and "using" plan assets in a manner § 406 squarely prohibits, and thus, Tenet engaged in transactions prohibited by both § 406(a) and § 406(b).

**DEFENDANTS ENGAGED IN SELF-DEALING AND CAUSED MANY PROHIBITED TRANSACTIONS IN VIOLATION OF ERISA**

175. From 2019 through 2024, the Plan Fiduciaries caused, directed, and authorized tens of thousands of transactions, both directly extracting money from the accounts of Plan participants or indirectly by reducing the net value of investment options held by Participants in the Plan, causing Plan Participants to pay over $33 million directly for Plan Expenses as well as additional amounts indirectly to the Plan's third-party administrators that should have been covered fully or in part by Forfeited Plan Assets.

176. These direct transactions are memorialized in Plan level accounting, *e.g.*, a trust report of the Plan. In this case the Tenet Plan Fiduciaries chose to use a non-transparent fee methodology to cover plan expenses to hide the plan expenses from plan participants by requiring the Plan's Expenses to be paid from the total annual operating expenses of the Plan's investment options. As a result, the Tenet Plan Fiduciaries caused the Plan to engage in thousands of transactions that resulted in a portion of the total annual operating expenses of the Plan's investment options to be paid by Plan participants to the managers of the Plan's investment options who, in turn, sent a portion of that revenue back to the Plan to be held in a plan level account and used to pay the Plan expenses directly (and indirectly as well-see below) to the Plan's service providers.

177. Moreover, throughout at least a portion of the Class Period, Tenet Plan Fiduciaries directed and authorized Plan Participants to pay an indeterminable amount of indirect compensation for Plan Expenses. The amount of indirect compensation paid by Plan participants to cover Plan Expenses is not able to be calculated by the documents available to Plaintiffs and is in the possession of the Defendants who have not provided that information to Plaintiffs.

178. Had the Tenet Plan Fiduciaries acted in accordance with the terms of the Plan document and ERISA the Tenet Plan Fiduciaries should have directed the use of Forfeited Plan Assets to defray the Plan Expenses that Tenet Plan Fiduciaries instead required Plan Participants to directly pay through transactions from their individual accounts or indirectly through the operating expense of the investment options in the Plan.

179. Throughout the Class Period, Tenet Plan Fiduciaries also caused the Plan to engage in several transactions with Tenet, a party in interest, related to Tenet's contractual obligation to make declared Tenet's matching contributions to the Plan. For each of these transactions, the Tenet Plan Fiduciaries coordinated with the third-party recordkeeper and Tenet to calculate how much Tenet could reduce its obligatory payment to the Plan by offsetting the full amount owed with the use of Forfeited Plan Assets.

180. In each of these instances, Tenet Plan Fiduciaries caused the Plan to engage in a transaction with Tenet that directly resulted in a smaller amount of money being paid by Tenet into the Plan.

181. In other words, several times throughout the Class Period the Tenet Plan Fiduciaries engaged in calculations for the express purpose of calculating how much money Tenet could save from its declared contractual obligation to the Plan by using Forfeited Plan Assets to offset the amount of Tenet's contribution.

182. As noted above, each of these transactions are also memorialized in the Plan trust reports. Each of these transactions serves to provide the assets necessary to execute thousands of transactions to invest Tenet Matching Contributions and Forfeited Plan Assets pursuant to the investment instructions of Plan Participants.

183. In other words, each of these transactions involves the receipt of Tenet Matching Contributions and calculations related to Forfeited Plan Assets to enable a combination of Forfeited Plan Assets and Tenet Matching Contributions to be combined for use in following the investment instructions of thousands of Plan Participants.

184. Specifically, throughout the Class Period, the Tenet Plan Fiduciaries engaged in the conduct of making calculations that caused the Plan to receive at least $35 million less in declared Tenet Matching Contributions than what Tenet was obligated to make and which increased Company profits by at least $35 million.

185. Additionally, the Tenet Plan Fiduciaries caused the Plan to engage in these transactions with Tenet that constituted and resulted in the use of Forfeited Plan Assets for the direct and indirect benefit of Tenet, a party in interest and Plan fiduciary.

186. Throughout the Class Period, by directing, authorizing, and causing several transactions with Tenet and tens of thousands of transactions with Plan Participants, Tenet Plan Fiduciaries dealt with the Forfeited Plan Assets in their own individual interest and in Tenet's interest by using Forfeited Plan Assets to offset Tenet's contractual obligations to the Plan.

187. Throughout the Class Period, by directing, authorizing, and causing several transactions with Tenet and tens of thousands of transactions with Plan Participants, the individual Tenet Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, *i.e.*, Tenet, whose interests are adverse to the Plan or Plan Participants.

188. Throughout the Class Period, by directing, authorizing, and causing several transactions with Tenet and tens of thousands of transactions with Plan Participants, the individual Tenet Plan Fiduciaries received consideration for their own personal accounts from Tenet as a result of their control over the transactions described above with a party in interest, *i.e.*, Tenet, involving the Forfeited Plan Assets, that enabled Tenet to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.

## PLAN WIDE RELIEF

158. ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). *See* 29 U.S.C. § 1132(a)(2).

159. Indeed, ERISA breach-of-fiduciary duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176-77, 142 S. Ct. 737, 211 L. Ed. 2d 558 (2022).

160. The Fifth Circuit has recognized that individual plan participants in defined contribution plans have an ERISA-recognized interest in the plan assets as a whole because the losses suffered by individual plan participants are "coterminous" with the loss to the entire plan. *Perez v. Bruister*, 823 F.3d 250, 257-58 (5th Cir. 2016).

161. Plaintiffs here seek relief on behalf of the Plan, *i.e.*, in this case for all Plan Expenses that should have been defrayed with Forfeited Plan Assets, and not only the losses to their individual account.

## CLASS ACTION ALLEGATIONS

162. Plaintiffs' claims can be certified as class claims pursuant to Federal Rule of Civil Procedure 23.

163. In acting in their representative capacity for the Plan, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Tenet Healthcare Corporation 401(k) Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning September 4, 2019, and running through the date of judgment.

164. The class includes over 140,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

165. There are questions of law and fact common to this class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Thus, common questions of law and fact include but are not limited to the following:

a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b. Whether Defendants breached their duty to follow the terms of the Plan;

c. Whether Defendants breached their fiduciary duties to the Plan with respect to their management and allocation of Forfeited Plan Assets;

d. Whether Plan Fiduciaries engaged in prohibited transactions with Forfeited Plan Assets;

e. What are the losses to the Plan resulting from each alleged breach of ERISA; and

f. What Plan-wide equitable and other relief the Court should impose to remedy Defendants' alleged breaches.

166. Plaintiffs' claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

167. Plaintiffs will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the Class Period, have no interest that conflicts with the class, are committed to the vigorous representation of the class, and have engaged experienced and competent lawyers to represent the class.

168. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

169. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

170. Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the class.

## COUNT I
## Breach of the Duty to Follow Terms of the Plan Document Pursuant to 29 U.S.C. 1104(a)(1)(D) Against the Tenet Plan Fiduciaries

171. Plaintiffs reallege and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

172. As alleged herein, 29 U.S.C. 1104(a)(1)(D) imposes a fiduciary duty to act in accordance with the Plan documents and instruments governing the Plan.

173. The Plan required the Tenet Plan Fiduciaries to use the Forfeited Plan Assets to pay all Plan Expenses (both direct and indirect) prior to using Forfeited Plan Assets to reduce Tenet's declared contributions. Tenet Plan Fiduciaries failed to discharge their duty to act in accordance with the Plan document by using Forfeited Plan Assets to reduce employer declared contribution obligations in violation of the explicit terms of the Plan.

174. As a direct and proximate result of Tenet Plan Fiduciaries' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Tenet Plan Fiduciaries are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Tenet Plan Fiduciaries resulting from the breach of their duty to follow the terms of the Plan document.

175. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

176. Plaintiffs and the class have suffered losses as a direct result of the Tenet Plan Fiduciaries' breach of their fiduciary duty to follow the terms of the Plan document.

## COUNT II

**Breach of ERISA's Fiduciary Duty of Loyalty Pursuant to 29 U.S.C. 1104(a)(1)(A) Against the Tenet Plan Fiduciaries**

177. Plaintiffs reallege and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

178. When exercising discretion and control over Forfeited Plan Assets and using them to reduce Tenet's declared contributions, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan Participants, the Tenet Plan Fiduciaries considered the best interest of Tenet and ignored the Plan document as opposed to the best interest of participants, in violation of ERISA.

179. Alternatively, when exercising discretion and control over Forfeited Plan Assets and failing to use them to defray the reasonable costs of administering the Plan, the Plan Fiduciaries considered the best interests of Tenet, as opposed to participants, in violation of ERISA.

180. When exercising control over Forfeited Plan Assets, the Tenet Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act ***solely*** in the interest of the Plan Participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan Participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan in violation of ERISA.

181. As a direct and proximate result of Tenet Plan Fiduciaries' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Tenet Plan Fiduciaries are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

183. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

184. Plaintiffs and the class have suffered losses as a direct result of the Tenet Plan Fiduciaries' breach of their duty of loyalty.

## COUNT III
**Breach of ERISA's Fiduciary Duty of Prudence Pursuant to 29 U.S.C. 1104(a)(1)(B) Against the Tenet Plan Fiduciaries**

185. When exercising discretion and control over Forfeited Plan Assets and using them to reduce Tenet contributions, the Tenet Plan fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act ***solely*** in the interest of the Plan participants and beneficiaries and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA.

186. In deciding how to allocate Forfeited Plan Assets, the Tenet Plan fiduciaries failed to undertake a reasoned and impartial decision-making process. Rather than investigate whether using Forfeited Plan Assets to defray Plan Expenses before offsetting Tenet matching contributions would have been better for Plan participants and more consistent with their duties under ERISA, the Tenet Plan Fiduciaries reflexively used Forfeited Plan Assets to reduce Tenet's own

contribution expenses while only devoting 8.95% of Forfeited Plan Assets available for direction from Plan Years 2019-2024 toward Plan Expenses. The Tenet Plan fiduciaries imprudent process can be further inferred from the fact that, on information and belief, there was no risk of Tenet not making its matching contributions and no indication that Tenet's contribution levels were informed by the amount of Forfeited Plan Assets, and thus no benefit to participants from using Forfeited Plan Assets to offset Tenet matching contributions instead of to defray Plan Expenses.

187. By refusing to use Forfeited Plan Assets to defray the Plan Expenses charged to participant accounts, and instead deciding to use virtually all those Forfeited Plan Assets to reduce Tenet's own contribution expenses, the Tenet Plan fiduciaries caused participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

188. The Tenet Plan Fiduciaries also failed to investigate whether allowing millions of dollars of Forfeited Plan Assets to sit in an unallocated plan account at the end of each year instead of using those amounts to defray Plan Expenses was in the interest of the Plan and its participants. By instead allowing those Forfeited Plan Assets to remain unallocated, the Tenet Plan Fiduciaries caused the value of Plan Participants' individual accounts to decrease as a result of expense deductions that would otherwise have been defrayed in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

189. Had the Tenet Plan fiduciaries conformed with the minimum standard of care required under ERISA, the Tenet Plan fiduciaries would not have used virtually all the Forfeited Plan Assets to reduce Tenet contributions.

190. Alternatively, had the Tenet Plan fiduciaries conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan up to the amount of unallocated Forfeited Plan Assets.

191. Plaintiffs have suffered losses as a direct result of the Tenet Plan fiduciaries breach of their duty of prudence.

## COUNT IV
### Fiduciary Prohibited Transactions/ Self-Dealing Pursuant to 29 U.S.C. 1106(b) Against the Tenet Plan Fiduciaries

192. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

193. 29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

194. Tenet Plan Fiduciaries were and continue to be Plan fiduciaries. In their management and control of Forfeited Plan Assets, Tenet Plan Fiduciaries caused the Plan to use Plan assets (Forfeited Plan Assets) to fund Tenet's contractual obligation to make declared matching contributions to the Plan. By allocating these Plan assets toward offsetting declared matching contributions obligations, Tenet Plan Fiduciaries saved Tenet millions of dollars in declared and contractually obligated Tenet matching contributions expenses. Tenet Plan Fiduciaries therefore

dealt with the assets of the Plan in their own interest or for Tenet's own account, in violation of 29 U.S.C. § 1106(b)(1).

195. Additionally, Tenet Plan Fiduciaries in their individual capacity or as an agent of Defendant Tenet acted in a transaction involving the Plan on behalf of a party (Defendant Tenet) whose interests are adverse to the interests of the Plan and the interests of Plan participants and their beneficiaries in violation of 29 U.S.C. § 1106(b)(2) and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan (Forfeited Plan Assets) in violation of 29 U.S.C. § 1106(b)(3).

196. As a result of this prohibited conduct, Tenet Plan Fiduciaries caused the Plan and Plan Participants and class to suffer losses in the amount of the Plan assets that were substituted for declared Tenet Matching Contributions and lost earnings on those assets.

197. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## COUNT V
**Fiduciary Prohibited Transactions/ Party in Interest Pursuant to 29 U.S.C. 1106(a) Against the Tenet Plan Fiduciaries**

198. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

199. 29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect. . . exchange. . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

200. Tenet is a party in interest, as that term is defined under 29 U.S.C. § 1002 (14), because it is the employer of Plan participants and a fiduciary with the duty to monitor Tenet Plan Fiduciaries.

201. The Plan's third-party administrators and other service providers are also parties in interest. *See Cunningham*, 145 S. Ct. at 1025 ("[ERISA], in turn defines a "party in interest'" to include various plan insiders, including the plan's administrator, sponsor, and its officers, as well as entities providing services to [the] plan.") (internal citations omitted).

202. When Tenet Plan Fiduciaries elected to use Forfeited Plan Assets as a substitute for future Tenet employer contributions to the Plan, thereby saving Tenet millions of dollars in declared contribution expenses, Tenet Plan Fiduciaries caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

203. As a result of these prohibited transactions, Tenet Plan Fiduciaries caused the Plan to suffer losses in the amount of the Forfeited Plan Assets that were not used to defray Plan Expenses and lost investment returns on those assets.

204. Additionally, when Tenet Plan Fiduciaries elected to use Forfeited Plan Assets as a substitute for declared Tenet Matching Contributions to the Plan and not for Plan Expenses, Tenet Plan Fiduciaries caused the Plan to engage in prohibited transactions with the Plan's third-party administrator and other service providers for the payment of Plan Expenses from Plaintiffs and all Plan Participants' individual accounts, both directly and indirectly, that were sent to the

Plan's third-party administrators and other third party service providers and that should have been paid in part or full by the Forfeited Plan Assets.

## COUNT VI
### Breach Of Erisa's Anti-Inurement Provision Pursuant to 29 U.S.C. 1103(C)(1) Against the Tenet Plan Fiduciaries

205. Plaintiffs reallege and incorporate herein by reference each preceding paragraph of this Amended Complaint as though fully set forth herein.

206. Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

207. The balance in a participant's accounts that a participant forfeits when incurring a break in service prior to full vesting of the Tenet's contributions to the participant's account is an asset of the Plan.

208. By electing to utilize the majority of these Plan assets as a substitute for Tenet's own future contributions to the Plan, thereby saving Tenet millions of dollars in contribution expenses, Tenet Plan Fiduciaries caused the assets of the plan to inure to the benefit of the employer and failed to defray reasonable expenses of the plan in violation of 29 U.S.C. § 1103(c)(1) and 29 U.S.C. § 1104(a)(1)(A).

209. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from violation of ERISA's anti-inurement provision as alleged in this claim and to restore to the Plan all profits secured through their use of Plan assets. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

210. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT VII
## Failure to Adequately Monitor Other Fiduciaries Against Tenet

211. Plaintiffs reallege and incorporate herein by reference each preceding paragraph of this Amended Complaint as though fully set forth herein.

212. Defendant Tenet had the authority to appoint and remove members or individuals responsible for Plan forfeitures on the RPAC and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

213. In light of this authority, Defendant Tenet had a duty to monitor those individuals responsible for Plan forfeitures on the RPAC to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

214. Defendant RPAC had a duty to ensure that the individuals responsible for Plan forfeitures possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's forfeitures; and reported regularly to Tenet.

215. The objectively disloyal, imprudent, and conflicted manner in which the RPAC handled Plan forfeitures inferentially establish that Defendant Tenet breached its duty to monitor by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan forfeitures on the RPAC or have a system in place for doing so, standing idly by as the Plan misallocated Plan forfeitures for Tenet's benefit;

b. Failing to monitor the process by which the RPAC of the Plan was evaluated and failing to investigate the proper use of Plan forfeitures; and

c. Failing to remove individuals responsible for Plan forfeitures on the RPAC whose performance was inadequate in that these individuals continued to misallocate Plan forfeitures for the benefit of Tenet.

216. As the consequences of the breaches of the duty to monitor for Plan forfeitures, the Plaintiffs and participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

217. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant Tenet is liable to restore to the Plan all losses caused by its failure to adequately monitor individuals responsible for Plan forfeitures on the RPAC. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## <u>PRAYER FOR RELIEF</u>

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully requests that the Court:

- Find and declare that Defendants failed to follow the terms of the Plan, breached their fiduciary duties, and engaged in prohibited conduct and transactions as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;
- Order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;
- Determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;
- Order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);
- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;
- Certify the class, appoint Plaintiffs as class representatives, and appoint the Chirinos Law Firm PLLC, Milberg, PLLC, Edelsberg Law, Shamis & Gentile P.A., and Kendal Law Group PLLC as class counsel;
- Award to and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

December 5, 2025

Respectfully submitted,

*/s/ Joe Kendall*

JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
214-744-3000 / 214-744-3015 fax
jkendall@kendalllawgroup.com

**CHIRINOS LAW FIRM PLLC**
Tulio D. Chirinos (admitted *pro hac vice)*
20283 State Road 7, Suite 592
Boca Raton, Florida 33498
Telephone: (561) 299-6334
tchirinos@chirinoslawfirm.com

**BLOOM LEGAL LLC**
Seth J. Bloom, Texas Bar No. 24094426
825 Girod Street, Suite A
New Orleans, Louisiana 70113
Telephone: (504) 599-9997
Email: sjb@bloomlegal.com

Alexandr Rudenco*
Arlene Boruchowitz*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com
aboruchowitz@milberg.com

Andrew Shamis, Texas Bar No. 5195185
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299

Gabriel Mandler*
Omer Kremer*
**EDELSBERG LAW**
20900 NE 30th Ave
Aventura, FL 33180
Tel: (305) 975-3320
scott@edelsbergiaw.com
gabriel@edelsberglaw.com
omer@edelsberglaw.com

**Pro Hac Vice Application Forthcoming*

***Attorneys for Plaintiffs and Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on all counsel of record on December 5, 2025 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

/s/ *Joe Kendall*
Joe Kendall